Chad M. Mandell (Cal. Bar No. 272775)
**THE LAW OFFICE OF CHAD M. MANDELL**
16350 Ventura Boulevard, Suite D-807
Encino, California 91436
Telephone: (310) 595-6368
(ChadMandell@Mandell-Law.com)

Franklin S. Abrams, Ph.D. (*pro hac vice* forthcoming)
**HOFFMAN WARNICK, LLC**
540 Broadway, 4th Floor,
Albany, New York 12207
Telephone: (518) 334-6310
(abrams@hoffmanwarnick.com)

Counsel for ALPHA-O PEPTIDES AG and PETER BURKHARD, PH.D, Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| ALPHA-O PEPTIDES AG, a Swiss limited company, PETER BURKHARD, PH.D., an individual,<br><br>Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA ON BEHALF OF THE UNIVERSITY OF CALIFORNIA – IRVINE, a public trust, SUNOMIX THERAPEUTICS, entity form unknown, LBACHIR BENMOHAMED, PH.D, an individual, MOHAMMED BOUZIANE, PH.D, an individual, and DOES 1 THROUGH 50, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1. **CIVIL RICO (18 U.S.C 1962(c))**<br>2. **CIVIL RICO (18 U.S.C 1962(d))**<br>3. **VIOLATION OF DEFEND TRADE SECRET ACT (18 U.S.C § 1836(b))**<br>4. **MISAPPROPRIATION OF TRADE SECRET (CAL. CIV. CODE § 3426)**<br>5. **FRAUDULENT CONCEALMENT**<br>6. **FRAUD (INTENTIONAL MISREPRESENTATION)**<br>7. **FRAUD (INTENTIONAL MISREPRESENTATION)**<br>8. **CONVERSION**<br>9. **PATENT INFRINGMENT**<br>10. **PATENT INFRINGMENT**<br>11. **PATENT INFRINGMENT**<br>12. **BREACH OF WRITTEN CONTRACT**<br>13. **APPROPRIATION OF LIKENESS (CAL. COMMON LAW)**<br>14. **APPROPRIATION OF LIKENESS (CAL. CIV. CODE § 3344)**<br>15. **TRADE LIBEL** |

**COMPLAINT**

**16. UNFAIR BUSINESS PRACTICES**
**(VIOLATION OF BUS. & PROF.**
**CODE § 17200)**
**17. UNJUST ENRICHMENT**
**18. INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

Plaintiffs, ALPHA-O PEPTIDES AG ("AOP" or "Alpha-O Peptides") and PETER BURKHARD, PH.D ("Burkhard") (collectively, "Plaintiffs"), hereby bring the following claims against Defendants, REGENTS OF THE UNIVERSITY OF CALIFORNIA ON BEHALF OF THE UNIVERSITY OF CALIFORNIA – IRVINE ("UCI"), SUNOMIX THERAPEUTICS ("Sunomix"), LBACHIR BENMOHAMED, PH.D ("BenMohamed"), and MOHAMMED BOUZIANE, PH.D ("Bouziane") (collectively, "Defendants"), and each of them, with knowledge as to themselves and otherwise on information and belief, and allege as follows:

## INTRODUCTION

*"We are committed to doing what is right – and being transparent about it – even when no one is watching."*

(Excerpt from "Mission Statement" of UCI.[1])

1.      Notwithstanding UCI's admirable mission statement, UCI and its co-Defendants have plainly failed to practice what they preach.  As described in greater detail herein, Defendants have participated in rampant fraud on a scale that is almost unimaginable in a public university setting.  They have **fabricated and forged** numerous documents, misappropriated Plaintiffs' trade secrets, defrauded Plaintiff (not to mention the federal government), engaged in extortion, trade libel, conversion, violations of the RICO Act, and the list, unfortunately, goes on.

---

[1] UCI, https://ce.uci.edu/about/mission/ (last visited September 18, 2023).

2.     Plaintiffs are the owners of patents and trade secrets for innovative technology ("SAPN" technology) used to design and produce potent vaccines. Plaintiffs and Defendants entered into a series of narrowly constructed license agreements, which allowed Defendants to utilize Plaintiffs' SAPN technology under very limited circumstances and conditions.  Unfortunately, unbeknown to Plaintiffs, Defendants breached their obligations under the agreements, again and again.

3.     For example, in violation of the license agreements, Plaintiffs applied for numerous federal grants using Plaintiffs' SAPN technology.  Further, because Defendants were applying for the grants behind Plaintiffs' backs, Defendants falsely claimed that *they owned* Plaintiffs' trade secrets (which Defendants published in the grant proposals).  Defendants also fabricated a letter of support, giving the false impression that their unauthorized use of patented SAPN technology had been approved. Defendants went so far as to forge Burkhard's signature on the fake letters of support.

4.     And if the fake letters of support weren't enough, Defendants also submitted **falsified records stating that Burkhard worked for Sunomix** – complete with a fake Sunomix email address for Burkhard, a fake phone number for Burkhard, a fake title (Chief Science Officer), and a fake salary for Burkhard – which we presume Defendants kept because Burkhard never received or knew about it.  The fake employment information served a dual-purpose Defendants.  First, it gave the false impression that that Burkhard had approved of Defendants' use of the SAPN technology for these grant proposals (since according to Defendants, he worked for them).  Second, it made it that much easier for Defendants to conceal their wrongdoing, since the federal government now had the wrong contact information for Burkhard and AOP.

5.     Additionally, Defendants **published Plaintiffs' trade secrets in a U.S. Patent Application and on Sunomix's website** and, on both occasions, claimed that they (Defendants) were the owners of Plaintiffs' proprietary SAPN technology.

Further, notwithstanding the significant amount of fraud in which Defendants were engaged, they were still able to put on a false face, approach Plaintiffs, and pretend to negotiate new license agreements in good faith, even while violating the existing License Agreements behind Plaintiffs' backs.

6.     Because Defendants took active measures to conceal their misconduct (e.g., pretending to be interested in negotiating new license agreements, failing to advise Burkhard of the unauthorized grant proposals and patent application, giving the federal government fake contact information for Burkhard), Burkhard did not begin to uncover Defendants' scheme until he noticed the unauthorized grant proposals online, on or about September 22, 2020.  Burkhard continued to investigate, and in November 2020, he sent inquiries to Defendants and eventually to the NIH.

7.     In response to Burkhard's inquiry, UCI and its co-Defendants were neither "transparent," nor were they particularly interested in "integrity" or in "doing the right thing when no one is watching," when questions began to be asked about their unauthorize grant proposals.   Instead, Defendants were more interested in retaliating against Burkhard.  Therefore, Bouziane forwarded an email to Burkhard (purportedly from "unknown" source) threatening to have Burkhard ***arrested and hauled before a judge*** if he stepped foot in the United States.

8.     Meanwhile, the NIH began asking questions, at which point, BenMohamed and UCI attempted to save themselves by smearing Plaintiffs' SAPN technology with completely false, unsubstantiated, and libelous statements, which they sent to the NIH.  Defendants also manufactured another fake document, this time a fake license agreement (Exhibit F) that purportedly granted Defendants the rights they never received in the legitimate license agreements.

9.     Defendants' misconduct has all but ruined Plaintiffs. Defendants have stripped Burkhard of his life's work.  Plaintiffs can no longer monetize their SAPN technology because Defendants already published Plaintiffs' trade secrets online and in patent applications, and smeared the efficacy and utility of Plaintiffs' SAPN

technology.  Additionally, there is no easy path for Plaintiffs to apply for patent protection as to certain trade secrets, which Defendants have sabotaged in their unauthorized patent application.  In addition, Plaintiff have lost significant business opportunities, since potential business partners and investors have questioned whether Plaintiffs own the trade secrets that Defendants wrongfully published.

10.     Therefore, Plaintiffs file this action, seeking in the justice system the fairness, transparency, and integrity that Defendants profess in mission statements but fail to deliver in practice.

## THE PARTIES

11.     **Plaintiff Alpha-O Peptides, AG:** AOP is, and at all relevant times has been, a biotechnology company, operating in Riehen, Switzerland.  AOP focuses on the development of potent vaccines.  Specifically, AOP utilizes a proprietary technology to create a controlled process in which proteins self-assemble into nanoparticles, commonly referred to as "self-assembling protein nanoparticles" (SAPNs).   AOP's SAPNs are engineered to resemble specific disease-causing viruses (for example, herpes simplex virus (HSV), COVID, human immunodeficiency virus (HIV), etc.).  When AOP's SAPNs are introduced, as a vaccine, to the immune system, they train the immune system to respond to the particular virus they resemble.

12.     **Plaintiff Peter Burkhard, Ph.D.:** Burkhard is, and at all relevant times has been, a citizen and resident of Switzerland, and a prominent scientist in the field of biomechanical engineering.  From 2004-2015, Burkhard served as a Professor of Molecular and Cellular Biology at the University of Connecticut.  In 2011, Burkhard received the prestigious five-year NIH-Avant-Garde-Medications Development Award for his work in developing a nicotine vaccine.[2]  Over the years, Burkhard has

---

[2]https://www.nih.gov/news-events/news-releases/nida-avant-garde-medications-development-award-winners-announced.

established an extended network of professional relationships at many of the major pharmaceutical companies that are involved in vaccine design and development (e.g., Sanofi, GSK, Pfizer, and Merck, among others) and has engaged in numerous collaborative efforts to develop vaccines for such diseases and illnesses as influenza (Flu), respiratory syncytial virus (RSV), cytomegalovirus (CMV), HSV, COVID, malaria, HIV, toxoplasmosis, and many more.

13.     Burkhard is a prominent figure in his field of science.  Among other things, his work in developing a COVID vaccine attracted significant media attention in Switzerland and Germany early in the pandemic.  On March 23, 2020, the primary newspapers of the major cities of Switzerland published a report on Burkhard's COVID project. (See, e.g., Zürich – Tagesanzeiger; Basel – BaslerZeitung; Bern – BernerZeitung.)[3]  Burkhard was also broadcasted on several occasions by the Swiss national television, during the year 2020, by the German speaking channel (SRF; Schweizer Radio und Fernsehen – Interviewer: Mario Nottaris)[4] and the Italian speaking channel (RSI; Radiotelevisione svizzera – Interviewer: Roselli Maria).[5]

14.     **Regents of the University of California on Behalf of the University of California – Irvine:** Plaintiffs are informed and believe, and thereon allege, that UCI is a public trust corporation, organized and existing under the laws of the State of California.  Plaintiffs are further informed and believe, and thereon allege, that UCI has its principal place of business in the County of Orange, State of California.

15.     **Sunomix:** Plaintiffs are informed and believe, and thereon allege, that

---

[3] Tagesanzeiger, https://www.tagesanzeiger.ch/diese-schweizer-forschen-nach-einem-corona-impfstoff-159091301567, last checked 09/19/2023.  On information and belief, "Tagesanzeiger" is the largest daily newspaper in Switzerland.

[4] SRF, https://www.srf.ch/news/schweiz/schweizer-impfstoffforschung-wer-wird-der-erste-sein, last checked 09/19/2023.

[5] https://www.rsi.ch/la2/programmi/informazione/ Speciali_Covid-19/Speciale-informazione-Coronavirus-12943928.html, link currently not active as of 09/19/2023.

Sunomix is an entity, form unknown, with a principal place of business in the County of San Diego, State of California.

16.     **Lbachir BenMohamed, Ph.D.:** Plaintiffs are informed and believe, and thereon allege, that BenMohamed is, and at all relevant times has been, an individual residing in the County of Orange, State of California.  Plaintiffs are further informed and believe, and thereon allege, that at all relevant times, BenMohamed has been employed by UCI as a professor and as the Director of the Laboratory of Cellular and Molecular Immunology in the Department of Ophthalmology.  Plaintiffs are further informed and believe, and thereon allege, that since at least 2016, BenMohamed has been employed as a scientist and immunologist at Sunomix (see Exhibit H) and has, therefore, been an agent of both UCI and Sunomix.

17.     **Mohammed Bouziane, Ph.D.:** Plaintiffs are informed and believe, and thereon allege, that Bouziane is, and at all relevant times has been, an individual residing in the County of San Diego, State of California.  Plaintiffs are further informed and believe, and thereon allege, that at all relevant times, Bouziane has served as the CEO of Sunomix.[6]

18.     The true names and capacities of Defendants designated herein as Does 1 through 50, whether each is an individual, a business, a public entity, or otherwise, are presently unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names.  Plaintiffs allege that each Doe Defendant is responsible in some actionable manner for the events alleged herein.  Wherever in this Complaint it refers to "Defendants," such reference shall mean and include each of the expressly named defendants and all doe defendants.  Plaintiffs will amend the Complaint to state the

---

[6] As of the filing of this complaint, Bouziane's LinkedIn profile, indicates he is the CEO of Sunomix.  Further, Bouziane has signed several documents in this matter as the CEO of Sunomix. (LinkedIn, https://www.linkedin.com/in/mohammed-bouziane-ph-d-38148061/, last checked on 09/19/2023.)

true names and capacities of said doe defendants when the same have been ascertained.

19.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, Defendants, including the defendants sued herein as Does 1 through 50, and each of them, was the authorized agent and/or employee and/or joint venturer and/or co-conspirator of other defendants and was at all times acting within the course and scope of such agency and/or employment with the full knowledge, consent, authority, ratification, and/or permission of each of the remaining defendants.

20.     Plaintiffs are informed and believe, and based thereon allege, that Defendants, including Does 1 through 50, are responsible in some manner – either by act or omission, strict liability, fraud, negligence or otherwise – for the events and happenings alleged in this Complaint, and, thus, caused harm to Plaintiffs.

21.     Plaintiffs are currently unaware of additional persons or entities that might be legally responsible in some manner for the acts and/or omissions and the damages alleged or other relief sought herein.  Should Plaintiffs later discover information that suggests others are responsible in some manner for the acts and omissions described herein, and/or the damages or other relief sought herein, Plaintiffs will amend this Complaint to add any and all such Defendants, who are designated at this time only as Does 1 through 50, inclusive.

## JURISDICTION AND VENUE

22.     Jurisdiction is proper in the U.S. District Court for the Central District of California under 28 U.S.C. §§ 1331 and 1338, as it is a civil action arising under the laws of the United States - specifically 18 U.S.C. § 1836(b), 18 U.S.C. § 1962(c), 18 U.S.C. § 1962(d), and 35 U.S.C. § 1 et seq.  Plaintiffs are still in the process of quantifying their damages.  Nevertheless, such damages greatly exceed $75,000.

23.     Accordingly, this Court also has subject-matter jurisdiction on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).  The Court may also

exercise supplemental jurisdiction under 28 U.S.C. § 1367(a).  Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) or, alternatively, 28 U.S.C. § 1391(b)(3).

## **ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

### I.    **Relevant Scientific Concepts Concerning Antigens and Epitopes**

24.    **Antigens** "are molecular structures on the surface of viruses that are recognized by the immune system and are capable of triggering one kind of immune response known as antibody production."[7]

25.    An **epitope** is part of the antigen.  Specifically, the epitope is the part that is recognized by the immune system, and to which the immune system's antibodies, B-cells, or T-cells, attach.

### II.    **Plaintiffs' Breakthrough SAPN Technology**

26.    It is critically important to be able to respond to new emerging pandemics – as the world has seen during outbreaks of SARS and Ebola, and most recently during the COVID pandemic, which affected every single person world-wide.  AOP's SAPN technology is a groundbreaking and effective means to tackle such pandemic threats.

27.    Specifically, Plaintiffs' discovery allows scientists to easily design the surface of Plaintiffs' SAPNs to display epitopes of a target virus, and to arrange the epitopes to make the SAPN surface resemble the target virus.  Such SAPNs help the immune system learn to recognize and respond to the target virus.  Further, the ease and efficiency with which displays of epitopes can be designed and incorporated onto Plaintiffs' SAPNs enables effective vaccines to be designed quickly, and is part of what makes these SPANs a truly groundbreaking technology.  The fact that scientists can use a personal computer to efficiently design the display of epitopes, and thereafter, use very simple bio-technology methods in the lab to – in a few weeks'

---

[7] https://www.cdc.gov/flu/about/professionals/antigenic.htm.

time – incorporate the display of epitopes onto Plaintiffs' SAPNs, could help the world respond more quickly and efficiently to emerging pandemic threats.

28.     AOP has protected its research and development by obtaining patents that cover its pioneering innovations in self-assembling protein nanoparticles (SAPNs).  These patents directed to AOP's SAPNs provide a vaccine platform that enables efficient modular rational design development of superior targeted vaccines against infectious diseases, as explained in greater detail below.

### III.     Plaintiffs' Patents

**A.     Patent No. U.S. 8,575,110 (the "110 Patent")**

29.     **Peptidic nanoparticles as drug delivery and antigen display systems.** U.S. Patent Nos. 8,575,110 (the "110 Patent") describes and claims a new type of nanoparticle using the concept of self-organization of a single continuous chain to form peptidic nanoparticles. These nanoparticles can be used as drug targeting and drug delivery systems or as vaccines.

30.     The '110 Patent, entitled "PEPTIDIC NANOPARTICLES AS DRUG DELIVERY AND ANTIGEN DISPLAY SYSTEMS," was issued on 2013, is assigned to AOP and has been maintained. (A copy of the '110 Patent is attached hereto as Exhibit Q.)

31.     The '110 Patent names Peter Burkhard as the inventor.

**B.     Patent No. U.S. 8,546,337 (the "337 Patent")**

32.     U.S. Patent No. 8,546,337 (the "'337 Patent") describes and claims self-assembling peptide nanoparticles (SAPNs) incorporating T-cell epitopes and/or B-cell epitopes that are useful as vaccines and adjuvants.

33.     The '337 Patent, entitled "SELF-ASSEMBLING PEPTIDE NANOPARTICLES USEFUL AS VACCINES," was issued on October 1, 2013, is assigned to AOP and has been maintained.  (A copy of the '337 Patent is attached hereto as Exhibit R.)

34.    The '337 Patent names Peter Burkhard as the inventor.

**C.    Patent No. U.S. 10,245,318 (the "318 Patent")**

35.    U.S. Patent No. 10,245,318 (the "'318 Patent") describes and claims self-assembling protein nanoparticles useful as vaccines and for vaccination that are constructed from suitable oligomerization domains and incorporating the TLR5 binding protein flagellin as an adjuvant molecule.

36.    The '318 Patent, entitled "FLAGELLIN-CONTAINING PROTEIN NANOPARTICLES AS A VACCINE PLATFORM" was issued on April 2, 2019, is assigned to AOP and has been maintained.  (A copy of the '318 Patent is attached hereto as Exhibit S.)[8]

37.    The '318 Patent names Peter Burkhard, Senthil Kumar Raman, Sara Maria Paulillo, Matteo Piazza, Caroline Kulangara, and Christian Mittelholzer as co-inventors.

**IV.    The Trade Secrets**

38.    Plaintiffs' Trade Secrets ("Trade Secrets") consist of scientific, technical, and engineering information, to include without limitation the following: 1) scientific procedures for using the SAPN technology, described in the Patents, to engineer specific HSV and COVID-19 epitopes into the SAPNs; 2) computational SAPN-designs of epitopes for HSV, including confidential CD4 and CD8 epitopes and the proteins and/or protein domains of VP16, VP22, RR1, RR2 and gD; 3) epitopes of COVID-19, including different spike-derived peptide sequences as B-cell and T-cell epitopes.

39.    Plaintiffs took significant measures to restrict and protect access to the Trade Secrets.  Among other things, Plaintiffs entered into a Confidential Disclosure Agreement with Sunomix; included confidentiality provisions in various contracts

---

[8] The '110 Patent, the '337 Patent, and the '318 Patent shall, at times, be collectively referred to as the "Patents".

with Defendants; identified the Trade Secrets as "Confidential"; restricted access and use of the Trade Secrets to select individuals and entities; and contractually limited the permissible use of the Trade Secrets.

40. Many of the Trade Secrets were reflected in the designs which Plaintiffs sent to Defendants and marked "Confidential". (Exhibit "O".)

## V. Relevant Funding Programs of the National Institute of Health (NIH)

41. The NIH has different funding programs. For purposes of this Complaint, it is important to understand the difference between SBIR/STTR grants and R01/R21 grants.

42. **SBIR/STTR** grants are intended to provide funding for small businesses. However, recipients must be U.S. companies, located in the United States.[9] Foreign institutions and foreign components of U.S. organizations are not eligible for SBIR/STTR awards. Accordingly, AOP (a Swiss entity) is not eligible for SBIR/STTR awards.

43. **R01/R21** grants are intended to provide funding for general research projects. Foreign institutions are eligible to apply for R01/R21. Accordingly, AOP is eligible to apply for these grants, and in fact, AOP has received significant research funding from the NIH for its malaria and nicotine vaccine projects.

## VI. Relevant Contracts Involving Plaintiffs and Defendants

### D. The Confidentiality Disclosure Agreement of September 20, 2016

44. On or about September 20, 2016, AOP and Sunomix entered into a Confidential Disclosure Agreement ("CDA"), governing the exchange of confidential information between Plaintiffs and Sunomix. (A true and correct copy of the CDA is attached hereto as Exhibit P.) This CDA had a five-year term and addressed the

---

[9] https://seed.nih.gov/small-business-funding/small-business-program-basics/eligibility-criteria.

exchange of certain confidential information between Plaintiffs and Sunomix.

45.     The CDA included a robust confidentiality clause, pursuant to which, AOP and Sunomix agreed as follows:

> Disclosure of Confidential Information. Except as expressly permitted in this Section, for a period of five (5) years from expiration of the Term (as defined in Section 7 below) or termination of this Agreement, the Receiving Party shall hold in confidence and shall not directly or indirectly disclose, communicate or in any way divulge to any person any Confidential Information, without the prior written consent of the Disclosing Party. The Receiving Party shall (i) use such Confidential Information only for the purposes set forth herein or carrying out any agreement relating to the Confidential Information that is entered into by the parties….Receiving Party shall not use or exploit such Confidential Information for its own benefit or the benefit of another without the prior written consent of the Disclosing Party.
> (CDA [Ex. Q], p.1)

**E.     The Materials Transfer Agreement of November 16, 2016**

46.     On or about November 16, 2016, UCI, Sunomix, and AOP entered into the Materials Transfer Agreement ("MTA").  (A true and correct copy of the MTA is attached hereto as Exhibit A.)  Associate Director Kevin Kennan signed on behalf of UCI.  Bouziane signed on behalf of Sunomix.  Burkhard signed on behalf of AOP.

47.     At the outset, the MTA acknowledged that AOP was the owner of the SAPN technology.  (MTA [Ex. A], p.1 and Schedule 1.)  It was agreed that, subject to strict limitations, Sunomix could assist in producing and delivering SAPNs to UCI.  Thereafter, UCI could use the SAPN technology in a single, specified project, generate preliminary data, and use the data to apply for an SBIR grant.  (Id., p.1.)  That project is described as follows:

> We will use 2 prototype mouse CD4 and CD8 epitopes loaded in their "self-assembled delivery particles".  We will then perform a pilot vaccine experiment with a small number of mice (10 mice) to makes sure their "self-assembled delivery particles" works by protecting from herpes infection (i.e. HSV-1 and HSV-2).

(MTA [Ex. A], p.1 and Schedule 2.)

48.    The MTA expressly limited Defendants' right to use the SAPN technology for anything but 1) applying for a specific SBIR grant; and 2) in connection with the project described above.  The MTA provided:

> The Materials [defined as AOP's SAPN technology…(i) shall be used **solely in connection with the Project** …; (ii) are provided solely for investigational use in laboratory animals and/or <u>in vitro</u> studies but shall not be used in humans; (iii) shall not be used for commercial purposes; and (iv) except as allowed in the project, shall not be (or caused to be) modified, changed, derivatized….The term of this Agreement, which is the actual length of time during which the Materials may be used, shall expire one (1) year from the Effective Date of this Agreement [November 16, 2016].  Recipient [UCI] will not perform any study, research or analysis, other than the Project, without the prior written consent of Sunomix **and** Alpha-O Peptides.

(MTA [Ex. A], § 1, **emphasis added**.)

49.    The MTA provided for limited distribution and control of the of the SAPN technology:

> **Distribution and Control.** Recipient agrees not to transfer or distribute the Material to any third party without the prior written permission of Sunomix and AlphaO Peptides. In addition, Recipient shall allow only employees and agents under its direct control and supervision to have access to the Material. The Material shall be used only at Recipient's facilities under the direction of the Recipient Scientist. Recipient shall be free to publish the results of the Project; Recipient agrees to notify Sunomix and Alpha-O Peptides at least 30 days prior to publication. In the event that Sunomix and Alpha-O Peptides identifies any patentable subject matter contained within the publication, Sunomix and Alpha-O Peptides can delay publication for an additional 30 days to elect to request that Recipient file for patent protection contained within the publication at Sunomix's and Alpha-O Peptides's expense.

(MTA [Ex. A], § 2.)

50.     The MTA also included a robust confidentiality clause:

<u>Confidentiality</u>. Recipient [i.e., UCI] will not, either during or for a period of three(3) years after the term of this Agreement, disclose to any third person or use any Confidential Information of Sunomix and Alpha-O Peptides or its collaborators for any purpose other than the performance of the Project, without the prior written authorization of Sunomix and Alpha-O Peptides. This obligation shall not apply to information that is (i) in the public domain through no fault of Recipient, (ii) independently developed without use or incorporation of Confidential Information, (iii) was known to Recipient prior to disclosure, (iv) is rightfully received from a third party, or (v) required to be disclosed by law, governmental rule, or regulation or 'Order court with competent jurisdiction. For purposes of this Section 5, "Confidential Information" means all confidential or proprietary information provided by Sunomix and Alpha-O Peptides to Recipient that Sunomix and Alpha-O Peptides discloses to Recipient under this Agreement that is marked or described as confidential. If Recipient is requested or required (by oral questions, interrogatories, requests for information of documents, subpoena, civil investigation demand or similar process) to disclose any Confidential Information, Recipient will provide prompt notice to Sunomix and Alpha-O Peptides of such request, in advance of any such disclosure.

(MTA [Ex. A], § 5.)

51.     Finally, the MTA was subject to a one-year term:

The term of this Agreement, which is the actual length of time during which Materials may be used, shall expire one (1) year from the Effective Date of this Agreement.

(MTA [Ex. A], § 1 .)

**F.     The 2017 Licensing Agreement**

52.     On or about March 21, 2017, Sunomix and AOP entered into the "2017 Licensing Agreement". (A true and correct copy of the 2017 Licensing Agreement is attached as Exhibit B.) AOP agreed to license Plaintiffs' proprietary SAPN technology for purposes of preparing and submitting an STTR grant proposal for the development of an HSV vaccine. Accordingly, the award 1R41AI138764 (an

SBIR/STTR type award) was received by Defendants.

53.    The agreement provided that AOP would work exclusively with Sunomix **but only** for the project of engineering ten pairs of CD4/CD8 T-cell epitopes into the SAPNs.  The SAPNs were to be used only for immunization experiments described in the NIH-STTR HSV vaccine grant proposal.  The agreement stated, in pertinent part:

> Alpha-O owns valuable technology, intellectual property (US8575110, US8546337, EP2766386A1, EP2766386A1, EP17157687.9) and proprietary information related to the design, construction, and bio-production of self-assembling protein nanoparticles (SAPNs).

> For this project **of engineering ten pairs of CD4/CD8 T-cell epitopes into the SAPNs,** Alpha-O is willing to work exclusively with Sunomix and to transfer the technology for the bio-production of such SAPN-based HSV vaccines.

> Alpha-O will provide Sunomix at least 2 mg of pure protein of two SAPN-constructs.

> Sunomix will use the bio-production protocol provided by Alpha-O to generate nine similar HSV-SAPN constructs.

> Sunomix will be responsible to deliver at least 2 mg of pure SAPN-protein of eleven constructs (ten vaccine constructs and one negative control) to the laboratory of Dr. Lbachir Benmohamed at the University of California, Irvine, **to be used for the immunization experiments of the project described in the NIH-STTR HSV vaccine grant**.

(2017 Licensing Agreement [Ex. B], p.1, emphasis added.)

## G.    The 2018 License Agreement

54.    On or about September 7, 2018, Sunomix and AOP entered into the "2018 Licensing Agreement" to further develop the STTR grant proposal related to the HSV vaccine. (A true and correct copy of the 2018 Licensing Agreement is attached hereto as Exhibit C.)  As with the earlier agreements between Plaintiffs and

Defendants, the 2018 Licensing Agreement limited Defendants' permission to use Plaintiffs' SAPNs.  Specifically, Defendants could only use the SAPNs to write an SBIR or STTR proposal.  It also provided clear terms that were intended to protect AOP's patented SAPN technology and confidential trade secrets.

55.     The Executive Summary of the 2018 Licensing Agreement stated:

Sunomix….is an early state biotechnology company creating novel vaccines using AOP's proprietary self-assembling protein nanoparticles (SAPNs).  As its first deliverable product, Sunomix is developing a SAPN vaccine for the prevention and potential treatment of "*Ocular Herpes*" (OH).  Our expectation is to leverage the SAPN platform to develop a highly effective vaccine which combats the symptoms and/or onset of disease for the millions currently living with OH in the United States and worldwide.

(2018 License Agreement [Ex. C], p.1.)

56.     As the 2018 License Agreement further provided:

AOP grant[ed] Sunomix a non-exclusive license to write Small Business Innovation Research (SBIR) and Small Business Technology Transfer (STTR) grant proposal in collaboration with the non-profit institution University of California Irvine that will focus on the innovative SAPN vaccine platform.   The SBIR/STTR programs are structured in three phases…. (Id., ¶1.)  Among other things, it was agreed that "Sunomix will pay to AOP a non-refundable, non-creditable license fee of $20,000 USD for the Phase 1 SBIR/STTR approved OH grant." (Id., ¶1.1.)  It was further agreed that "Sunomix will pay to AOP a non-refundable, non-creditable license fee of $150,000 USD for the phase II SBIR/STTR approved OH grant.

(2018 License Agreement [Ex. C], ¶1.2.)

**H.     The April 11, 2020 and April 22, 2020 Agreements**

57.     On or about April 11, 2020 and April 22, 2020, Sunomix and AOP entered into two short-term license agreements, respectively, the "4/11/20 Agreement" and the "4/22/20 Agreement". (True and correct copies of the 4/11/20 Agreement and the 4/22/20 Agreement are attached, together, as Exhibit D.)

58.     The 4/11/20 Agreement and the 4/22/20 Agreement are virtually identical.  The Agreements state that AOP:

> [O]wns valuable technology, intellectual property (US8575110, US8546337, EP2766386A1, EP2766386A1, [and] EP17157687.9) and proprietary information related to the design, construction, and bio-production of self-assembling protein nanoparticles (SAPNs).

(4/11/20 Agreement [Ex. D],p. 1; 4/22/20 [Ex. D], Agreement, p. 1.)

59.     The 4/22/20 Agreement provides:

> Sunomix and AOP will work in partnership to raise funds to be able to start a Phase I clinical trial at the earliest possible date….[¶]…Sunomix will make best efforts to raise funds to support this Covid-19 vaccine development.  For a time period of 4 weeks, AOP grants Sunomix exclusive rights for a Covid-19 vaccine to above patents for the United States of America, with the option to obtain a license for more countries. If during this time period of 4 weeks Sunomix is making convincing progress raising sufficient funds as deemed by AOP, then this time period will be extended by another 4 weeks.  If Sunomix raise[es] the funds to be able to start a Phase I clinical trial, Sunomix exclusive rights for a Covid-19 vaccine to above patents for the United States of America will become valid in the US until the expiration date of all the patents.  If not…, then all patent rights shall return to AOP.

(Ex. E [4/22/20 Agreement], p.1.)

60.     Additionally, both agreements state:

> "If at some point a profit is made from this project the profit will be shared between Sunomix and AOP as follows:

> If the funds are raised by Sunomix, Sunomix will receive 50% of the profit and AOP will receive 50% of the profit.

> If the funds are raised by AOP, Sunomix will receive 40% of the profit and AOP will receive 60% of the profit."

(Ex. [D] [April 11, 2020 Agreement] and Ex. [E]; 4/22/20 Agreement, p.1.)

61.    The 4/11/20 Agreement was materially similar to the 4/22/20 Agreement, except that the term of this agreement was 14 days.

**VII.   <u>DEFENDANTS' EXPLOIT A FAKE LETTER OF SUPPORT, A FORGED SIGNATURE, AND AOP'S MISAPPROPRIATED IP TO APPLY FOR FEDERAL GRANT MONEY</u>**

62.    In late 2020, Burkhard learned that UCI and Sunomix submitted the following NIH grant proposals:

- On December 19, 2018, Grant Proposal 5R21AI147499;
- On April 11, 2019, Grant Proposal 1R01AI150091; and
- On May 22, 2020 Grant Proposal 1R01AI158060.

63.    In submitting the grant proposals listed above, Defendants exceeded the scope of their License Agreements with Plaintiffs, wrongfully infringed Plaintiffs' patents, and exposed Plaintiffs' Trade Secrets to the public.  Defendants were not permitted to apply for these grants.  The License Agreements clearly stated which grant proposals were authorized.  The three above were not among those.  Further, lacking permission to file these grant proposals, Defendants resorted to the following wrongful acts: for proposal 5R21AI147499, Defendants **manufactured a false supporting letter, complete with a forged signature** purportedly from Burkhard, in support thereof (Exhibit E); and for proposals R01AI150091 and 1R01AI158060, Defendants submitted falsified information stating that Burkhard is the CSO of Sunomix. (Exhibit G).

64.    In the Spring of 2019, Defendants defrauded Plaintiffs into assisting them prepare the application package for the unauthorized 1R01AI150091 proposal, by coaxing Plaintiffs with promises of a future contract.  Defendants omitted the fact that they had already misappropriated Plaintiffs' Trade Secrets, infringed their Patents, and breached their License Agreements by submitting the unauthorized 5R21AI147499 proposals behind their backs.  Nor did Defendants inform Plaintiffs that they intended to apply for the 1R01AI150091 proposal behind their back once

Defendants had what they needed from Plaintiffs.

65.     Even in pretending to negotiate terms with Plaintiffs, BenMohamed lied. For example, in an email to Burkhard dated March 25, 2019, BenMohamed told Burkhard that "[t]his whole R01 grant itself is $1.25M for 5 years ($250,000 per year)."  However, the actual budget, was $3,221,061.[10]  Then, on March 26, 2019, BenMohamed emailed Burkhard, promising to send a contract for what would become the 1R01AI150091 proposal: "For the paperwork and contract I will ask Angie Karchmer, our UCI contract officer, to start this contract paperwork." However, BenMohamed never intended to, and in fact did not, include Plaintiffs in the 1R01AI150091 proposal.  Instead, Defendants submitted the 1R01AI150091 proposal on their own, without informing Burkhard.

66.     Further, because Defendants never obtained Burkhard's permission, they misrepresented to the NIH that Burkhard worked for Sunomix and provided the NIH with:

- A fake email address for Burkhard (pburkhard@sunomixtherapeutics.com);

- A fake phone number for Burkhard, (858) 829-6063;

- A fake title at Sunomix, Chief Science Officer, even though Burkhard never worked at Sunomix; and

- A fake salary, that Defendants claimed must be included in the budget (and which, it can be inferred Defendants misappropriated – since Burkhard never received it).

67.     The following year, a very similar sequence of events played out when Defendants submitted the unauthorized 1R01AI158060 proposal.  Again, Defendants' fraudulently represented to the NIH that Burkhard served as the CSO of Sunomix,

_____

[10] This figure includes an IDC rate of about 57%. The exact amount is currently unknown to Plaintiffs but it is almost twice the $1.25M amount reported by BenMohamed.

with the same fake email address and a fake phone number for Burkhard.  (Exhibit G).  To cap it off, Defendants claimed that UCI and Sunomix owned AOP's proprietary SAPN-technology – the very same technology that UCI and Sunomix identified as being owned by AOP in the License Agreements.  Defendants knew exactly what they were doing in defrauding Plaintiffs (and the federal government).

## VIII. <u>UCI AND BENMOHAMED FILE A PATENT APPLICATION THAT INCLUDES AOP'S TRADE SECRETS</u>

68.     On or about August 8, 2019, UCI misappropriated Trade Secrets – designs which Burkhard had labeled "confidential" in a prior email – and filed them in U.S. Patent Application Publication No. 16/535,534, entitled "Protection Against Recurrent Genital Herpes by Therapeutic Immunization with Herpes Simplex Virus Type 2 Ribonucleotide Reductase Protein Subunits," which published as U.S. Patent Publication No. 2020/0046827A1 on February 13, 2020.  Further, UCI and BenMohamed falsely claimed that they owned the now-published Trade Secrets; falsely claimed they owned and generated valuable data provided by Plaintiffs; and failed to include any mention of Burkhard as a co-inventor, notwithstanding the presence subject matter in the claims that was invented by Burkhard.  Instead, Defendants falsely identified BenMohamed as the sole inventor in the patent application.

69.     In November 2020, after Burkhard began asking UCI and BenMohamed about the filing of a patent application with Plaintiffs' Trade Secrets/inventive contributions.  UCI acknowledged that materials from the joint SBIR project with Plaintiffs relating to SAPNs were included in the patent application.  Then, in a Reply to Office Action filed February 22, 2021, with the United States Patent and Trademark Office, UCI and BenMohamed canceled all claims in the patent application relating AOP's SAPN technology. No continuation application was filed, as would be standard practice to continue the prosecution of the SAPN technology, and without a pending patent application, the opportunity for Burkhard and AOP to

pursue this subject matter in a patent was effectively destroyed. The publication of the patent application eliminated Burkhard and AOP's Trade Secrets relating to this subject matter.

## IX. SUNOMIX ADVERTISES USING AOP'S TRADE SECRETS.

70. Similarly, on September 22, 2020, Plaintiffs discovered that Sunomix had published Plaintiffs' trade secrets on their website without permission and without any reference to Plaintiffs. (Exhibit I.) Rather, the SAPN technology is presented as if it were Sunomix's technology. The Partnership section of the website says:

> "Sunomix Therapeutics continue collaborative research with University of California Irvine. UCI is using our nano-vaccine prototype for Herpes Vaccine studies. "This is an unprecedented opportunity to exploit **our unique technology platform** to advance our understanding of protective immunity against Herpes, and thereby accelerate development and of a highly effective Herpes vaccine,"."

71. The entirety of the text of Sunomix's "Technology" webpage is more or less a copy-paste job from a document that Plaintiffs sent to Bouziane, and is thus plain plagiarism.

72. At present, Plaintiffs do not know any particulars about Sunomix' HIV-SAPN project listed in the Pipeline section of Sunomix' website, but clearly this project was not authorized by Plaintiffs. Plaintiffs look forward to learning more during the discovery phase.

## X. DEFENDANTS RETALIATE

### A. Plaintiffs Confront Defendants And Seek Information.

73. In or about November/December 2020, Plaintiffs alerted UCI and Sunomix that it had just become aware of alarming conduct by Defendants. Plaintiffs explained that they had become aware that UCI and Sunomix had submitted several applications for NIH grants using Plaintiffs' patents and trade secrets and applied for a patent protection with the U.S. Patent Office using the Plaintiffs' Trade Secrets.

Consequently, AOP's Trade Secrets were now in the public domain and were stripped of their value.  Further, Defendants had infringed Plaintiffs' patents and created a cloud of uncertainty around them, leaving Plaintiffs' unable to capitalize on significant opportunities to utilize their next-generation vaccine technology, including during the COVID pandemic.

74.    As Plaintiffs continued to investigate and learn more about Defendants wrongdoing, they kept UCI apprised of many of their findings – including that UCI had received federal research money based on forged documents.  UCI repeatedly denied wrongdoing; refused to accept responsibility while at the same time refusing to send information that would have aided Plaintiffs in their investigation – such as unredacted copies of the unauthorized research proposals.  Similarly, Sunomix refused to accept service of requests for further information or acknowledge email requests.  Instead, it seems as though Defendants had other plans for responding to Plaintiffs.

**B.    Defendants Harass and Extort Burkhard**

75.    In response to Plaintiffs' good faith attempts to confront and investigate Defendants' conduct, Bouziane, forwarded an e-mail to Burkhard (on behalf of an unidentified person) claiming that, among other things, Defendants will have Burkhard arrested and prosecuted if he returns to the United States and/or fails to stop his good faith investigation into Defendants' wrongdoing:

> Please tell Peter that UCI and BenMohamed are considering filling a Lawsuit  of defamation of Character in Germany, Switzerland and in USA
>
> Tell him that he might be arrested the next time he comes to USA because he insulted officially USA and the US Gouvernment in this emails by saying United Stated are encouraging criminal activities. He will need to explain what he means with this in front of a judge and he will need to pay millions in damage.
>
> I am not taking this lightly

Either he needs to apologize officially and abandon this non sense route he is taking or he will pay huge price and he might be arrested. The lawyer is asking when the next time he is planning to visit the United States"

(Exhibit J.)

76.    Bouziane himself reiterated the extortionist threat, warning Plaintiffs: "I think they will file it."  (Id.)  When Plaintiffs informed UCI of the threat, they responded, on May 31, 2022: "[W]e do not believe there has been any misconduct on the part of The Regents."

**C.    Defendants Attempt To Cover Up Their Wrongdoing With A Fake Contract And Forged Signature.**

77.    In or about January 2021 – after Plaintiffs notified UCI that they had become aware of their unauthorized grant proposals – Defendants attempted to conceal their conspiracy to steal Plaintiffs' Trade Secrets by creating a fake contract that purported to grant them broader rights than they actually had.  They even forged Burkhard's signature.  This fake contract (the "Fake 2017 License Agreement") is purportedly dated March 21, 2017. (A true and correct copy of the Fake 2017 License Agreement is attached as Exhibit F.)

78.    The Fake 2017 License Agreement falsely states that AOP agreed that its intellectual property may be used by Defendants in connection with **all proposals** for SAPN applications toward herpes vaccine.  In contrast, the real 2017 License Agreement provided that Plaintiffs would work on an exclusive basis with Sunomix **only as necessary to engineer ten pairs of CD4/CD8 T-cell epitopes into SAPNs**. The real 2017 License Agreement provided that the SAPNs were to be used only for immunization experiments described in the NIH-STTR HSV vaccine grant proposal.

79.    Significantly, prior to signing the real 2017 License Agreement, Defendants attempted to obtain the broad contractual rights contained in the Fake 2017 License Agreement, but AOP clearly denied this request.

### D.    UCI And Sunomix Libel Plaintiffs SAPN Technology

80.    After Plaintiffs voiced their concerns about the wrongful conduct of UCI and Sunomix, BenMohamed notified Plaintiffs that UCI was discontinuing the SAPN technology because it supposedly had stability issues.

81.    Then, on or about December 17, 2020, BenMohamed directed the following defamatory email to NIH Program Officer Dr. Stemmy:

> "We have already made our first multi-epitope Coronavirus vaccine into 3 delivery systems (1) SAPN nanoparticles (2) modified mRNA like Pfizer and Moderna and (3) Adenovirus (like AstraZeneca). We compared all the 3-delivery systems in our animal models, and it turned out that mRNA and Adenovirus works better than SAPN. These results will be published soon as well. We therefore now focus on mRNA and Adenovirus as antigen delivery systems and this will not change anything on the scope of our project. This is because the same epitopes are used in each of the 3 delivery systems."

82.    This was a malicious smear and is absolutely, demonstrably false.  In contrast to the self-serving and false statements of BenMohamed, the COVID-SAPNs show superb immunologic potency.  Immunological data now available to AOP clearly demonstrates, AOP's SAPNs are as immunogenic and as neutralizing as the Pfizer/BioNTech RNA COVID vaccines.  Further, the HSV- and COVID-SAPNs have demonstrated superb long-term storage properties.  These, SAPN constructs that were sent by AOP to UCI in the years of 2016 to 2020 were completely perfect after two years of storage at room temperature.  Compare this to the RNA COVID vaccines that require storage at -80º, and therefore, require an extremely complicated supply chain with the set-up of special vaccine centers.

### FIRST CLAIM FOR RELIEF
### CIVIL RICO (18 U.S.C 1962(c))
#### (By Plaintiffs Against All Defendants)

83.    Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 82, inclusive with the same force and effect as though fully set forth herein.

84.    Defendants formed an association-in-fact enterprise (the "Enterprise") to

engage in activities to affect interstate and foreign commerce by collaborating to, among other things:

- misappropriate and use Plaintiffs' trade secrets to unlawfully apply for federal funding and patent protection with the U.S. Patent Office;
- fraudulently manufacture and present a fake contract purporting to be signed by Burkhard to apply for federal funding and patent protection with the U.S. Patent Office, and thereafter, cover their tracks;
- fraudulently manufacture and present a fake letter of support purporting to be signed by Burkhard to apply for federal funding, and thereafter, cover their tracks;
- falsely claim that Burkhard was the Chief Science Officer of Sunomix, including falsely purporting to pay Burkhard a salary to apply for federal funding using Burkhard's patents and trade secrets;
- extort and intimidate Burkhard so that he would not pursue claims against Defendants;
- evade liability and intimidate Plaintiffs by wrongfully and fraudulently disparaging their SAPN technology; and
- manufacture vaccine products for sale and distribution in the United States and internationally.

85. The Enterprise operated by Defendants includes Sunomix, BenMohamed, Bouziane, and UCI but is separate and distinct from each of them.

86. In furtherance of the Enterprise, Defendants committed the following acts, without limitation:

a. Defendants obtained by fraud, artifice, and deception, and, without Plaintiffs' authorization, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Plaintiffs' trade secrets, including specifically their Trade Secrets, and conspired with each other to do the same;

b. Defendants received, acquired, or possessed Plaintiffs' trade secrets, knowing that they had been stolen, obtained, or converted without Plaintiffs' authorization, and conspired with each other to do the same;

c. Defendants fraudulently identified Burkhard as the Chief Science Officer of Sunomix in connection with an application for federal funding and grants (NIH awards 1R01AI150091 and 1R01AI158060) and, on information and belief, Defendants used mail or wire to engage in such fraud;

d. Defendants fraudulently presented a fabricated contract, with a forged signature purporting to be from Burkhard, in connection with an application for federal funding and grants (NIH awards 5R21AI147499, 1R01AI150091 and 1R01AI158060) and, on information and belief, Defendants used mail or wire to engage in such fraud;

e. Defendants fraudulently a fabricated letter of support, again with a forged signature purporting to be from Burkhard, in support of an application for federal funding and/or grant money (NIH award 5R21AI147499) and, on information and belief, Defendants used mail or wire to engage in such fraud; and

f. When Burkhard attempted to assert his rights against Defendants, Defendants extorted and retaliated against Burkhard by threatening to have him arrested and pay millions of dollars in damages, if he returned to the United States.

87. Defendants intentionally engaged in these acts to benefit themselves, with the knowledge or intent that these acts would injure Plaintiffs. They did so at least in the Central District of California.

88. The actions of Defendants in California constitute racketeering activities in violation of 18 U.S.C § 1832. On information and belief, this pattern of activity poses a threat of continuing because Defendants are continuing to proceed with

projects using Plaintiffs trade secrets and patents, including an HIV project. In the alternative, there is close-ended continuity as to Plaintiffs' conduct, which occurred regularly from December 19, 2018.

89.     Defendants Sunomix and UCI benefited from the racketeering activities of their employees, Bouziane and BenMohamed, and the racketeering activities of Defendants Bouziane and BenMohamed were committed within the scope of their employment while at Sunomix and UCI.

90.     Plaintiffs incurred and continue to incur substantial internal investigation costs, computer forensic costs and increased operational costs as a result of Defendants' misappropriation, constituting concrete financial loss and injury to Plaintiffs.

91.     As a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(c) by Defendants, Plaintiffs has suffered economic damages both domestically and abroad, including, but not limited to, injuries in the Central District of California and throughout the world in an amount to be proven at trial.

92.     The aforementioned acts of Defendants were done willfully, with malice toward Plaintiffs, entitling Plaintiffs to treble damages, attorneys' fees, and costs.

93.     The racketeering activities and violations of 18 U.S.C. § 1962(c) has caused and will continue to cause Plaintiffs irreparable and substantial injury and therefore cannot be fully redressed through damages alone.  An injunction prohibiting Defendants from further acquisition, disclosure, use, and possession of the Plaintiffs trade secrets is necessary to provide Plaintiffs with complete relief.

94.     If Defendants were permitted to continue to engage in their racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs would be irreparably harmed and the economic damages to Plaintiffs will be difficult to quantify.

## SECOND CLAIM FOR RELIEF
## CIVIL RICO (18 U.S.C 1962(d))
### (By Plaintiffs Against All Defendants)

95.     Plaintiffs hereby re-allege and incorporate by reference paragraphs 1

through 194, inclusive with the same force and effect as though fully set forth herein.

96.   Defendants have intentionally conspired and agreed to directly and indirectly participate in the affairs of the Enterprise through a pattern of racketeering activities in violation of 18 U.S.C § 1832, as described in Claim I.

97.   Defendants knew that their actions constituted a pattern of racketeering activities and agreed to those actions in furtherance of, and for the benefit of the Enterprise, as described in Claim I.

98.   The actions of the Defendants constitute a conspiracy to violate 18 U.S.C § 1962(c), in violation of 18 U.S.C § 1962(d).

99.   As a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(d) by Defendants, Plaintiffs have suffered economic damages both domestically and abroad, including, but not limited to, injuries in the Central District of California and throughout the world, in an amount to be proven at trial.

100.   The aforementioned acts of Defendants were done willfully, with malice toward Plaintiffs, entitling Plaintiffs to treble damages, attorneys' fees, and costs.

### THIRD CLAIM FOR RELIEF
### MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C § 1836(b))
**(By Plaintiffs Against All Defendants)**

101.   Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 100, inclusive with the same force and effect as though fully set forth herein.

102.   The above alleged facts constitute actual and threatened misappropriation of the Plaintiffs' Trade Secrets by Defendants under 18 U.S.C. §§ 1836 and 1839.

103.   At all times relevant to this Complaint, Plaintiffs owned Trade Secrets, including but not limited to, those attached hereto as Exhibit "O." The designs contain Plaintiffs' Trade Secrets, including proprietary and secret scientific, technical, and engineering information, to include without limitation the following: 1) scientific

procedures for using the SAPN technology, described in the AOP Patents, to engineer specific HSV and COVID-19 epitopes into the SAPNs; 2) computational SAPN-designs of epitopes for HSV, including confidential CD4 and CD8 epitopes and the proteins and/or protein domains of VP16, VP22, RR1, RR2 and gD; 3) epitopes of COVID-19, including different spike-derived peptide sequences as B-cell and T-cell epitopes.

104.    Plaintiffs took reasonable measures to protect the secrecy of the Trade Secrets.  Among other things, Plaintiffs included confidentiality provisions in its contracts with Defendants and/or entered into separate confidentiality agreements. Plaintiffs also identified the Trade Secrets as being, "Confidential".  (Exhibit O.) Plaintiffs also took measures to restrict and protect access to the Designs.

105.    The Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

106.    The Trade Secrets are related to and used in Plaintiffs' products and services sold or intended for use in interstate or foreign commerce.

107.    Plaintiffs derive significant economic benefits from owning the Trade Secrets.  Specifically, these Trade Secrets were the subject of license agreements and Plaintiffs intended to use the Trade Secrets in future patent applications and/or to create new inventions for future patent applications.

108.    Defendants improperly acquired, disclosed, used, appropriated, took, carried away, concealed, copied, duplicated, downloaded, replicated, transmitted, sent, uploaded, communicated, or conveyed the Trade Secrets for the benefit of Defendants, and each of them.

109.    Specifically, and without Plaintiffs' permission, Defendants filed a patent application which resulted in the publication of Plaintiffs' Trade Secrets in U.S. Patent Application Publication No. US20200046827A1, causing the Trade

Secrets to be publicly disclosed.  Further, Plaintiffs infer based on the information available, that Defendants also published the Trade Secrets or at least described them without permission in several grant proposals submitted to the NIH.  Sunomix and Bouziane also published the Trade Secrets on Sunomix's website. Again, the use of the Trade Secrets by Defendants was without Plaintiffs' authorization.  Plaintiffs did not consent to Defendants' acquisition (by fraud), disclosure, or use of the Defendants' Trade Secrets.

110.   Defendants performed such acts in furtherance of their unlawful trade secret misappropriation in at least the Central District of California.

111.   Defendants intended to convert the Trade Secrets to the economic benefit of one other than their owner, Plaintiffs.

112.   Defendants knew and intended that Plaintiffs, as the owners of the Trade Secrets, would be injured by their actions.

113.   As a result of Defendants' misappropriation of the Trade Secrets, Plaintiffs have suffered actual damages in an amount to be proven at trial.

114.   As a result of the Defendants' misappropriation, Defendants have been unjustly enriched.

115.   Plaintiffs further plead entitlement to a reasonable royalty to compensate Plaintiffs for Defendants' misappropriation of Trade Secrets.

116.   Plaintiffs are informed and believe, and thereon allege, that Defendants' misappropriation of the Trade Secrets was willful and malicious based on the facts alleged herein.  Defendants acted with a purpose and willingness to commit the acts alleged, and Defendants' conduct was not reasonable under the circumstances. Plaintiffs are therefore entitled to exemplary damages and attorney's fees and costs against Sunomix, BenMohamed, Bouziane, and Does 1-25.  Plaintiffs further seek exemplary damages against Sunomix, BenMohamed, Bouziane, and Does 1-25 in an amount up to two times the amount of Plaintiffs' actual damages, according to proof under 18 U.S.C. § 1836.

117.   The misappropriation of the Trade Secrets has caused and will continue to cause Plaintiffs irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

118.   If Defendants were permitted to continue to use and disseminate Plaintiffs' trade secrets (i.e. the Trade Secrets), Plaintiffs will be irreparably harmed and the economic damages to Plaintiffs would be difficult to quantify.  An injunction prohibiting Defendants from further acquisition, disclosure, use, and possession of the Trade Secrets is necessary to provide Defendants with complete relief.

119.   Defendants' wrongful conduct alleged herein by their misappropriation of Plaintiffs' Trade Secrets will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Plaintiffs' business, and it could cause Defendants to have improper advantages, positions, and rights in the marketplace to Plaintiffs' detriment.  Absent injunctive relief, Defendants further disclosure and use of Plaintiffs' trade secrets could irreparably harm Plaintiffs.

**FOURTH CLAIM FOR RELIEF**
**TRADE SECRET MISAPPROPRIATION UNDER THE CALIFORNIA**
**UNIFORM TRADE SECRETS ACT (CAL. CIV. CODE § 3426)**
**(By Plaintiffs Against All Defendants)**

120.   Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 119, inclusive with the same force and effect as though fully set forth herein.

121.   Plaintiffs sue under the California Uniform Trade Secrets Act based on the misappropriation of their trade secrets in California through Defendants' improper disclosure of Plaintiffs' trade secrets (i.e. the Trade Secrets) to patent agents in California, the use by those Defendants in preparing their Patent Filings based on Plaintiffs' trade secrets, and UCI, BenMohamed, and Does 1-50's use of Plaintiffs' trade secrets in applying for federal funding.

122.   The Plaintiffs' trade secrets constitute information, including designs, scientific information, methods, techniques, or processes that derive independent economic value from not being generally known to the public or other persons who

can obtain economic value from the trade secrets' disclosure.

123.   Specifically, the Trade Secrets depicted in Exhibit O are among Plaintiffs' Trade Secrets.  The designs depict scientific, technical, and engineering information, all of which is proprietary and secret, including without limitation the following: 1) scientific procedures for using the SAPN technology, to engineer specific HSV and COVID-19 epitopes into the SAPNs; 2) computational SAPN-designs of epitopes for HSV, including confidential CD4 and CD8 epitopes and the proteins and/or protein domains of VP16, VP22, RR1, RR2 and gD; 3) epitopes of COVID-19, including different spike-derived peptide sequences as B-cell and T-cell epitopes.

124.   Plaintiffs have taken reasonable measures to protect the secrecy of the Plaintiffs trade secrets.  Among other things, Plaintiffs included confidentiality provisions in its contracts with Defendants and/or entered into separate confidentiality agreements. Plaintiffs also identified the Trade Secrets as being, "Confidential". (Exhibit O.)  Plaintiffs also took measures to restrict and protect access to the Designs.

125.   However, Defendants intended to and knowingly stole and, without authorization, disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Plaintiffs' Trade Secrets.

126.   Defendants acquired, used or disclosed Plaintiffs' Trade Secrets, knowing that they have been stolen, obtained, or converted without Plaintiffs' authorization.  Defendants intentionally engaged in these acts to benefit Defendants, and each of them, with the knowledge or intent that these acts would injure Plaintiffs.

127.   As a direct and proximate result of violations of Cal. Civ. Code § 3426.1 by Defendants, Plaintiffs have suffered economic damages both domestically and abroad, including, but not limited to, in the Central District of California and throughout the world, in an amount to be proven at trial but greatly exceeding

$75,000.

128.   The aforementioned acts of Defendants were done willfully, with malice toward Plaintiffs.

129.   As a result of Defendants' misappropriation, Plaintiffs have suffered actual damages and Defendants have been unjustly enriched.  Plaintiffs plead in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, then Plaintiffs are entitled to a reasonable royalty to compensate Plaintiffs for misappropriation of trade secrets by Defendants.

130.   Plaintiffs further seek exemplary damages against BenMohamed, Bouziane, Sunomix and Does 1-25 in an amount up to two times the amount of Plaintiffs' actual damages according to proof under Cal. Civ. Code § 3426.3.

131.   Plaintiffs are informed and believe, and thereon allege, that BenMohamed, Bouziane, Sunomix and Does 1-25's misappropriation of Plaintiffs' trade secrets was willful and malicious based on the facts alleged herein. BenMohamed, Bouziane, Sunomix and Does 1-25 acted with a purpose and willingness to commit the acts alleged, and his conduct was not reasonable under the circumstances.  Plaintiffs are therefore entitled to exemplary damages, attorney fees, and costs under Cal. Civ. Code § 3426.4.

132.   The wrongful conduct and misappropriation of Plaintiffs' trade secrets alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Plaintiffs' business, and it could cause Defendants to have improper advantages, positions, and rights in the marketplace to Plaintiffs' detriment.  Absent injunctive relief, further disclosure and use of Plaintiffs' trade secrets by Defendants would irreparably harm Plaintiffs.

### FIFTH CLAIM FOR RELIEF
### FRAUDULENT CONCEALMENT
**(By Plaintiffs Against Defendants)**

133.   Plaintiffs hereby re-allege and incorporate by reference paragraphs 1

through 132, inclusive with the same force and effect as though fully set forth herein.

134.   Defendants had a duty to make full and complete disclosure to Plaintiffs of all material facts relating to Defendants' filing and prosecution of the patent application US20200046827A1 and submission of proposals for NIH awards 5R21AI147499, 1R01AI158060, and R01AI150091 directed to AOP's SAPN technology that Plaintiffs developed and subsequently disclosed to Defendants in confidence.

135.   Defendants' duty of full and complete disclosure arose from, among other things, the confidential working relationship that Defendants had with Burkhard relating to AOP's SAPN technology developed by Burkhard and the preparation of confidential grant proposals for NIH awards 1R01AI158060, and R01AI150091 relating to AOP's SAPN technology.  In light of their confidential working relationship, Plaintiffs understood and expected that Defendants would not use or exploit for Defendants' own benefit materials and information that Plaintiffs disclosed to Defendants in confidence during the course of their relationship, including materials and information reflected in Burkhard's contribution to proposals 1R01AI158060, and R01AI150091.

136.   Defendants' duty of full and complete disclosure also arose from, among other things, Defendants' filing and prosecution of the patent application US20200046827A1 including AOP's SAPN technology that Plaintiffs disclosed in confidence to Defendants and as to which Burkhard is a true inventor. Because Burkhard is a true co-inventor of the inventions claimed in the patent application US20200046827A1, Defendants had a duty to disclose to Plaintiffs, all material facts relating to the filing and prosecution of the patent application.

137.   Defendants' duty of full and complete disclosure also arose from, among other things, incomplete and misleading statements that Defendants made to Plaintiffs regarding Defendants' proposals for NIH awards 5R21AI147499, 1R01AI158060, and R01AI150091 relating to AOP's SAPN technology that Plaintiffs disclosed in

confidence to Defendants. A party to a business transaction who makes incomplete statements to the other party regarding the subject matter of the transaction becomes obligated to make a full and complete disclosure of all material facts relating to that transaction.

138.   Defendants breached their duty of full and complete disclosure by failing to disclose and deliberately concealing from Plaintiffs material facts relating to Defendants' filing of the patent application US20200046827A1 directed to AOP's SAPN technology that Plaintiffs developed and subsequently disclosed to Defendants in confidence. In particular, Defendants failed to disclose and deliberately concealed from Plaintiffs that Defendants filed and prosecuted a patent application relating to AOP's SAPN technology that Plaintiffs developed and subsequently disclosed to Defendants in confidence, including that the patent application omitted Burkhard as inventor and instead included BenMohamed as the sole named inventor, even though Burkhard was a true co-inventor of the inventions disclosed and claimed in the patent application.

139.   Plaintiffs are informed and believe, and on that basis allege, that Defendants failed to disclose to Plaintiffs, and deliberately concealed from Plaintiffs, Defendants' applying for research funding and filing of the patent application, and the omission of Burkhard as inventors on that application, to avoid disrupting the beneficial relationship that Defendants enjoyed with Burkhard. They did so to secretly retain for Defendants' own benefit the financial, competitive and other benefits of AOP's SAPN technology, including the benefits from awards 5R21AI147499, 1R01AI158060, and R01AI150091 and the benefits afforded by patent protection.

140.   Defendants' fraudulent conduct was willful and wanton, such that Defendants acted with such recklessness or negligence to evince a conscious disregard of Plaintiffs' property rights.

141.   Plaintiffs have suffered damages as a result of Defendants' actions and

concealment, in an amount to be determined according to proof. For example, Defendants deprived Plaintiffs of the benefits, financial opportunities and prestige Plaintiffs would have enjoyed if Defendants had not sought and obtained in its own name NIH awards 5R21AI147499, 1R01AI158060, and R01AI150091 related to AOP's SAPN technology and if AOP and Burkhard had been duly recognized and credited with the invention of the patent application US20200046827A1.

## SIXTH CLAIM FOR RELIEF
## FRAUD
### (By Plaintiffs Against UCI And BenMohamed)

142.   Plaintiffs incorporate paragraphs 1 through 141, inclusive with the same force and effect as though fully set forth herein.

143.   "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." (Cal. Civ. Code § 1709.)

144.   In the Spring of 2019, BenMohamed, a managing director of UCI, made several false promises and material omissions to Plaintiffs, with the intent to deceive Burkhard into assisting BenMohamed and UCI to prepare what would ultimately become the unauthorized R01AI150091 Grant Proposal.  Specifically, BenMohamed and UCI made the following material misrepresentations:

    i.   In an email to Burkhard dated March 25, 2019 BenMohamed stated that "This whole R01 grant itself is $1.25M for 5 years ($250,000 per year)."

    ii.   In an email to Burkhard dated March 26, 2019, BenMohamed stated, "For the paperwork and contract I will ask Angie Karchmer, our UCI contract officer, to start this contract paperwork."

145.   These material statements by BenMohamed and UCI were false and intended to deceive Burkhard into believing that they would enter into a contract with Plaintiffs relating to what ultimately became the unauthorized R01AI150091 Grant Proposal.  BenMohamed and UCI never intended to enter such a contract with Plaintiffs, and made these statements only to induce Plaintiffs to provide assistance,

Trade Secrets, and proprietary information relating to the SAPNs.  Once they had acquired these things from Plaintiffs, BenMohamed and UCI submitted the unauthorized R01AI150091 grant proposal without Plaintiffs, behind Plaintiffs' back and without their knowledge, just as they did in submitting the unauthorized 5R21AI147499 grant Proposal.  Relatedly, on or about March 26, 2019, and throughout the Spring of 2019, BenMohamed and UCI omitted the following material facts in coaxing Plaintiffs to provide assistance and proprietary information relating to the SAPNs:

    iii.    BenMohamed and UCI had *already* submitted the unauthorized 5R21AI147499 Grant Proposal behind Plaintiffs' back and without permission;

    iv.    BenMohamed and UCI had published Plaintiffs' trade secrets and infringed their patented SAPN technology in submitting the unauthorized 5R21AI147499 Grant Proposal;

    v.    BenMohamed and UCI had a fabricated letter of support, with a forged signature purportedly signed by Burkhard, which they used in submitting the unauthorized 5R21AI147499 Grant Proposal.

146.   At the time BenMohamed and UCI made the misrepresentations described herein (at Paragraph 144, subparagraphs i and ii), they each knew the representations were false.  Further, BenMohamed and UCI knew that the omissions described herein (at Paragraph 145, subparagraphs iv, v, and vi) were material and inconsistent with their promises that they would enter into a contract relating to the subject matter of the R01AI150091 Grant Proposal.

147.   In the Spring of 2020, BenMohamed deceived Burkhard yet one more time into assisting him and UCI to prepare what would ultimately become the unauthorized 1R01AI158060 Grant Proposal.  Once they had acquired all materials from Plaintiffs, BenMohamed and UCI submitted the unauthorized 1R01AI158060 Grant proposal without Plaintiffs, behind Plaintiffs' back and without their

knowledge, just as they did in submitting the unauthorized 5R21AI147499 Grant Proposal in 2018 and the unauthorized R01AI150091 Grant Proposal in 2019.

148.   BenMohamed and UCI made the aforementioned representations and omissions with the intent to deceive and defraud Plaintiffs, and to induce Plaintiffs into providing with access to Plaintiffs' confidential and proprietary SAPN technology, including the Patents and Trade Secrets.  BenMohamed and UCI also made the aforementioned representations and omissions with the intent to fraudulently conceal their misappropriation of Plaintiffs' Trade Secrets, infringement of Plaintiffs' Patents, and conversion of Plaintiffs' proprietary materials relating to the SAPNs.

149.   The aforementioned representations and omissions deceived, defrauded, and induced Plaintiffs into providing BenMohamed and UCI with access to Plaintiffs' confidential and proprietary SAPN technology, including Patents and Trade Secrets.

150.   Defendants' misrepresentations and omissions were material.  Plaintiffs would not have provided Defendants with access to Plaintiffs' confidential and proprietary SAPN technology had Plaintiffs known that BenMohamed and UCI's express and implied representations were false.  Nor would Plaintiffs have provided Defendants with access to Plaintiffs' confidential and proprietary SAPN technology had Plaintiffs known the material facts these defendants omitted.  Plaintiffs actually, reasonably, and justifiably relied upon BenMohamed and UCI's representations and omissions.

151.   Any failure by Plaintiffs to determine the falsity of BenMohamed and UCI's  representations and omissions is excused by Defendants' superior knowledge of the facts and continued misrepresentations to Plaintiff.

152.   Plaintiffs have been substantially harmed by BenMohamed and UCI's misrepresentations and omissions, and have suffered damages as a legal, direct, and proximate consequence of BenMohamed and UCI's  conduct.  Plaintiffs' reliance on Defendants' representations was a substantial factor in causing them harm.

153.   BenMohamed and UCI intended to cause, and did cause, financial injury to Plaintiffs.  BenMohamed and UCI willfully misrepresented to Plaintiffs that BenMohamed and UCI could be trusted with Plaintiffs' SAPN technology.  However, after having been granted access to Plaintiffs' SAPN technology, BenMohamed and UCI used it to apply for federal funding and patent protection.  BenMohamed and UCI misappropriated Plaintiffs' SAPN technology, published it in a patent application, and used it to obtain federal funding.

154.   BenMohamed and UCI's  conduct was done with a conscious disregard for Plaintiffs' rights and with the intent to vex and annoy Plaintiffs.  BenMohamed and UCI's acts constitute oppression, fraud, and/or malice under California Civil Code § 3294, entitling Plaintiffs to an award of punitive damages in an amount appropriate to punish BenMohamed and UCI and deter others.

## SEVENTH CLAIM FOR RELIEF
## FRAUD
### (By Plaintiffs Against Sunomix And Bouziane)

155.   Plaintiffs incorporate paragraphs 1 through 154, inclusive with the same force and effect as though fully set forth herein.

156.    "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." (Cal. Civ. Code § 1709.)

157.   On or about April 11, 2020, Sunomix and Bouziane, the CEO of Sunomix, entered into a limited scope agreement with Plaintiffs.  At that time, Bouziane and Sunomix made the following misrepresentations:

    i.   In the April 11, 2020 License Agreement, Bouziane and Sunomix specifically represented that they would maintain the confidentiality of Plaintiffs' trade secrets;

    ii.   In the April 11, 2020 License Agreement, Bouziane and Sunomix specifically represented that they would not commercialize or otherwise

use these Plaintiffs' SAPN technology, except as outlined in this agreement;

158.    Relatedly, in entering the April 11, 2020 License Agreement, and in discussions leading up to the signing of that agreement, Bouziane and Sunomix intentionally omitted the following material facts in communications with Plaintiffs:

   iii.   Bouziane and Sunomix had breached prior contractual agreements with Plaintiffs concerning Plaintiffs' SAPN technology, specifically, by submitting the unauthorized 2018 and 2019 Grant Proposals behind Plaintiffs' back and without permission;

   iv.   Bouziane and Sunomix had published Plaintiffs' trade secrets and infringed their patented technology in submitting the unauthorized 2018 and 2019 Grant Proposal;

   v.   Bouziane and Sunomix had fabricated letter of support, with a forged signature purportedly by Burkhard, in support of the unauthorized 2018 and 2019 Grant Proposals; and

159.    At the time Bouziane and Sunomix made the misrepresentations described herein (at Paragraph 157, subparagraphs i and ii), each of these defendants knew the representations were false.  Further, Bouziane and Sunomix knew that the omissions described herein (at Paragraph 158, subparagraphs iv, v, and vi) were material to Plaintiffs' decisions and inconsistent with the promises these defendants made in the April 11, 2020 License Agreement.

160.    Bouziane and Sunomix made the aforementioned representations and omissions with the intent to deceive and defraud Plaintiffs, and to induce Plaintiffs to providing Defendants with access to Plaintiffs' confidential and proprietary SAPN technology, including among other things, the Patents and Trade Secrets.

161.    Bouziane and Sunomix also made the aforementioned representations and omissions with the intent to fraudulently conceal their misappropriation of Plaintiff's' Trade Secrets, their infringement of Plaintiffs' Patents, and their

conversion of Plaintiffs' proprietary information relating to the SAPN technology.

162.   The aforementioned representations and omissions deceived, defrauded, and induced Plaintiffs into providing Defendants with access to Plaintiffs' confidential and proprietary SAPN technology.

163.   Bouziane and Sunomix's representations and omissions were material to Plaintiffs decisions.  Plaintiffs would not have provided Bouziane and Sunomix with access to their Patents, Trade Secrets, and other proprietary information had Plaintiffs known these defendants' express and implied representations were false.  Nor would Plaintiffs have provided Bouziane and Sunomix with access to their Patents, Trade Secrets, and other proprietary information had known the facts that Bouziane and Sunomix' omitted.  Plaintiffs actually, reasonably, and justifiably relied upon Bouziane and Sunomix' representations and material omissions.

164.   Any failure by Plaintiffs to determine the falsity of Bouziane and Sunomix's representations and omissions is excused by Bouziane and Sunomix's superior knowledge of the facts and continued misrepresentations to Plaintiff.

165.   Plaintiffs have been substantially harmed by Bouziane and Sunomix's misrepresentations and omissions, and have suffered damages as a legal, direct, and proximate consequence of Bouziane and Sunomix's conduct.  Plaintiffs' reliance on Bouziane and Sunomix's representations was a substantial factor in causing them harm.

166.   Bouziane and Sunomix's intended to cause, and did cause, financial injury to Plaintiffs.  Bouziane and Sunomix's willfully misrepresented to Plaintiffs that Bouziane and Sunomix could be trusted with Plaintiffs' Patents and Trade Secrets.  However, after having been granted access to Plaintiffs' Patents, Trade Secrets, and other proprietary materials, Bouziane and Sunomix used it to apply for federal funding without Plaintiffs' knowledge or permission.

167.   Bouziane and Sunomix's conduct was done with a conscious disregard for Plaintiffs' rights and with the intent to vex and annoy Plaintiffs.  Bouziane and

Sunomix's acts constitute oppression, fraud, and/or malice under California Civil Code § 3294, entitling Plaintiffs to an award of punitive damages in an amount appropriate to punish Bouziane and Sunomix's and deter others.

### EIGHTH CLAIM FOR RELIEF
### CONVERSION
**(By Plaintiffs Against Defendants)**

168.    Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 167, inclusive with the same force and effect as though fully set forth herein.

169.    Plaintiffs are, and at all pertinent times were, the owner of materials and technology, including but not limited to, the Trade Secrets, all of which were merged into Plaintiffs' disclosures, which Burkhard prepared and delivered to Defendants for the preparation of the proposals for awards R01AI150091 and 1R01AI158060.

170.    Defendants have substantially interfered with the property – which Plaintiffs provided to Defendants in confidence and for the sole purpose of submitting one or more joint grant proposals to the NIH – by knowingly and intentionally filing and prosecuting patent application No. 16/535,534 using such property; and thereafter, failing to continue the prosecution of the subject matter relating to the Plaintiff's trade secrets and SAPNs in a continuation or divisional application, allowed the Plaintiff's intellectual property around this subject matter to go unprotected and published.

171.    Plaintiffs did not consent to such use of their property.

172.    As a direct and proximate result of Defendants' conversion of Plaintiffs' property, Plaintiffs have suffered, and will continue to suffer, harm and substantial damages in an amount and nature to be proven at trial.

173.    In furtherance of its conversion of Plaintiffs' property, Defendants failed to disclose and deliberately concealed from Plaintiffs' that Defendants filed and prosecuted patent application No. 16/535,534, that resulted in Plaintiff's property being published on February 13, 2020 in Patent Application Publication No. US2020/0046827A1, using the property that Plaintiffs disclosed to Defendants in

confidence. Defendants' conversion of Plaintiffs property and its failure to disclose and deliberate concealment of such conversion was willful and intentional.

174.   Defendants' conversion was willful and wanton, such that Defendants acted with such recklessness or negligence to evince a conscious disregard of AOP's property rights.

### NINENTH CLAIM FOR RELIEF
### INFRINGEMENT OF THE '337 PATENT
**(By Plaintiffs Against UCI)**

175.   Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 174, inclusive with the same force and effect as though fully set forth herein.

176.   On information and belief, Defendants have infringed and will continue to infringe at least one claim of the '337 Patent, pursuant to 35 U.S.C. §217(a) by making and/or using SAPNs in grant Proposal 5R21AI147499, grant Proposal 1R01AI150091, and Proposal 1R01AI158060. Defendants' infringement has damaged and will continue to damage Defendants, which are entitled to recover damages resulting from Defendant's wrongful acts in an amount to be determined at trial.

### TENTH CLAIM FOR RELIEF
### INFRINGEMENT OF THE '110 PATENT
**(By Plaintiffs Against UCI)**

177.   Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 176, inclusive with the same force and effect as though fully set forth herein.

178.   On information and belief, Defendants have infringed and will continue to infringe at least one claim of the '110 Patent, pursuant to 35 U.S.C. §217(a) by making and/or using SAPNs in grant Proposal 5R21AI147499, grant Proposal 1R01AI150091, and Proposal 1R01AI158060. Defendants' infringement has damaged and will continue to damage Defendants, which are entitled to recover damages resulting from Defendant's wrongful acts in an amount to be determined at trial.

/ / /

### ELEVENTH CLAIM FOR RELIEF
### INFRINGEMENT OF THE '318 PATENT
**(By Plaintiffs Against UCI)**

179.   Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 178, inclusive with the same force and effect as though fully set forth herein.

180.   On information and belief, Defendants have infringed and will continue to infringe at least one claim of the '318 Patent, pursuant to 35 U.S.C. §217(a) by making and/or using SAPNs in grant Proposal 5R21AI147499, grant Proposal 1R01AI150091, and Proposal 1R01AI158060. Defendants' infringement has damaged and will continue to damage Defendants, which are entitled to recover damages resulting from Defendant's wrongful acts in an amount to be determined at trial.

### TWELTH  CLAIM FOR RELIEF
### BREACH OF WRITTEN CONTRACT
**(By Plaintiffs Against All Defendants)**

181.   Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 180 inclusive, with the same force and effect as though fully set forth herein.

182.   On or about November 16, 2016, Plaintiffs and Defendants entered into a written contract, specifically, the Materials Transfer Agreement.  (Exhibit A.) Among the materials terms of this contract, UCI and BenMohamed specifically represented that they would maintain the confidentiality of Plaintiffs' SAPN technology and would not use such technology except as outlined in this contract.

183.   On or about March 21, 2017, Bouziane and Sunomix entered into a written contract with Plaintiffs, specifically, the 2017 License Agreement. (Exhibit B.)  Among the materials terms of this contract, Bouziane and Sunomix agree to maintain the confidentiality of Plaintiffs' SAPN technology and would not use such technology except as outlined in this contract.

184.   On or about September 7, 2018, Bouziane and Sunomix entered into a

written contract with Plaintiffs, specifically, the 2018 License Agreement.  (Exhibit C.) Among the materials terms of this contract, Bouziane and Sunomix agree to maintain the confidentiality of Plaintiffs' SAPN technology and would not use such technology except as outlined in this contract.

185.  On or about April 11, 2020 and April 22, 2020, Bouziane and Sunomix entered into two written contracts with Plaintiffs.  (Exhibit D.)  Among the materials terms of these contracts', Bouziane and Sunomix agree to maintain the confidentiality of Plaintiffs' SAPN technology and would not use such technology except as outlined in these contracts.

186.  Thereafter, Defendants breached the aforementioned agreements as follows:

   i.  On or about December 19, 2018, and continuing thereafter, all Defendants breached the MTA by applying for and receiving unauthorized NIH funding in connection with the 5R21AI147499 grant proposal;

   ii.  On or about December 19, 2018, and continuing thereafter, Sunomix and Bouziane breached the 2017 License Agreement by applying for and receiving unauthorized NIH funding in connection with the 5R21AI147499 grant proposal;

   iii.  On or about April 11, 2019, and continuing thereafter, Defendants breached the MTA by applying for and receiving unauthorized NIH funding in connection with the R01AI150091 grant proposal;

   iv.  On or about April 11, 2019, and continuing thereafter, Sunomix and Bouziane breached the 2017 License Agreement and the 2018 License Agreement by applying for and receiving unauthorized NIH funding in connection with the R01AI150091 grant proposal;

   v.  On or about May 22, 2020, and continuing thereafter, Defendants breached MTA by applying for and receiving unauthorized NIH funding in connection with the 1R01AI158060 grant proposal;

vi.   On or about May 22, 2020, and continuing thereafter, Sunomix and Bouziane breached the 2017 License Agreement, the 2018 License Agreement, the April 11, 2020 License Agreement, and the April 22, 2020 License Agreement by applying for and receiving unauthorized NIH funding in connection with the 1R01AI158060 grant proposal;

vii.   On or about August 8, 2019, Defendants breached that MTA by filing for the patent application US20200046827A1 using Plaintiffs' Trade Secrets and

viii.   On or about August 8, 2019, Sunomix and Bouziane breached the 2017 License Agreement, the 2018 License Agreement, the April 11, 2020 License Agreement, and the April 22, License Agreement by filing for the patent application US20200046827A1 using Plaintiffs' Trade Secrets.

187.   It was not until September 22, 2020, that Plaintiffs learned of Defendants' breach of the contracts identified herein.

188.   As a direct and proximate cause of Defendants' various breaches of these written contracts, Plaintiffs have suffered damages in an amount to be proven at trial, but which is not less than $75,000.

189.   Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the written contracts identified above, except those obligations that were waived by Defendants or which Plaintiffs were excused or prevented from performing.

190.   As a direct and proximate result of Defendants' breach of contract, Plaintiffs have suffered damages in an amount to be proven at trial, but far in excess of $75,000, plus interest.

## THIRTHEENTH  CLAIM FOR RELIEF
## COMMON LAW APPROPRIATION OF NAME OR LIKENESS
### (By Burkhard Against Defendants)

191.   Burkhard realleges and incorporates herein by reference the allegations

contained in paragraphs 1 through 190, inclusive, with the same force and effect as though fully set forth herein.

192.   Burkhard alleges that Defendants used his name in the unauthorized grant proposals discussed herein.  Burkhard further alleges that Defendants' use of Burkhard's name and likeness was an appropriation of Plaintiff's name without Burkhard's consent to the commercial advantage of Defendants.

193.   Burkhard alleges that as a direct and proximate result of Defendants' misappropriation of Plaintiff's name and likeness Plaintiff has suffered damages in an amount to be proven at trial.

## THIRTHEENTH  CLAIM FOR RELIEF
## STATUTORY APPROPRIATION OF NAME OR LIKENESS (VIOLATION OF CALIFORNIA CIVIL CODE § 3344)
### (By Burkhard Against Defendants)

194.   Burkhard realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 193, inclusive, with the same force and effect as though fully set forth herein.

195.   Burkhard alleges that Defendants knowingly used Burkhard's name and likeness in federal grant proposals.  Plaintiff further alleges that Defendants' use of Burkhard's name was a knowing appropriation name and was done knowingly and without Burkhard 's consent to the commercial advantage of Defendants. Specifically, Burkhard alleges that Defendants' knowing use and unauthorized use of Burkhard's name and likeness was for the commercial purposes of promoting and submitting Defendants' proposals for numerous lucrative federal grants.

196.   Burkhard alleges that as a direct and proximate result of Defendants misappropriation of Burkhard's name and likeness Plaintiff has suffered damages in an amount equal to the greater than the statutory minimum or the actual damages suffered by Burkhard as a result of the unauthorized use of Burkhard's name and likeness; and any Defendants' profits from the unauthorized use of Burkhard's name

and likeness that are attributable to the use and are not taken into account in computing the actual damages.

197.   Burkhard alleges that Defendants' conduct as herein alleged was perpetrated with malice, fraud and/or oppression as to justify an award of punitive and exemplary damage

## FIFTEENTH  CLAIM FOR RELIEF
## TRADE LIBEL
### (By Plaintiffs Against UCI and BenMohamed)

198.   Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 197, inclusive, with the same force and effect as though fully set forth herein.

199.    As described above, on or about December 17, 2020, UCI and BenMohamed, in retaliation for Plaintiffs' inquiry concerning Defendants' unauthorized use of Plaintiffs' SAPN technology, willfully and without justification emailed a written statement to the NIH, disparaging and defamatory the stability and utility of Plaintiffs' SAPN technology.

200.   The defamatory statements were untrue.

201.   UCI and BenMohamed knew the defamatory statements were untrue or acted with reckless disregard of the truth or falsity of the statements.

202.   UCI and BenMohamed knew or should have recognized that someone else might act in reliance on the statement, causing Plaintiffs financial loss.  Plaintiffs allege that these defendants published their false statements with oppression and malice.

203.   As a direct and proximate result of UCI and BenMohamed's defamation and trade libel, Plaintiffs have been damaged, the exact amount to be proven at trial.

204.   Upon information and belief, defendants' defamation and trade libel was oppressive, fraudulent and malicious, entitling Plaintiffs to punitive damages in excess of its compensatory damages, the exact amount to be proven at trial.

205.   Upon information and belief, UCI and BenMohamed threaten and

propose to perform further acts of defamation and trade libel; and unless defendants are restrained by appropriate injunctive relief, Plaintiffs will continue to suffer irreparable harm for which there is no adequate remedy at law

**SIXTHEENTH  CLAIM FOR RELIEF**
**UNFAIR BUSINESS PRACTICES (VIOLATION OF CALIFORNIA**
**BUSINESS & PROFESSIONS CODE § 17200)**
**(By Plaintiffs Against Defendants)**

206.    Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 205, inclusive, with the same force and effect as though fully set forth herein.

207.    Each of Plaintiffs and Defendants is a "person" within the meaning of California Business and Professions Code § 17201.

208.    Defendants' conduct in misappropriating Plaintiffs' Trade Secrets and appropriating Plaintiffs' likeness for commercial gain is an unlawful business act or practice.

209.    Each Plaintiff has suffered an injury in fact and has lost money or property as a result of Defendants' unfair competition within the meaning of California Business and Professions Code § 17204.

Plaintiffs are further entitled to judgment and equitable relief against these Defendants, as set forth in the Prayer for Relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by these Defendants as a result of such business acts or practice, in addition to a civil penalty imposed pursuant to California Business and Professions Code § 17206(b).  Plaintiffs further seek to enjoin Defendants to cease and desist from engaging in the practices described herein.

/ / /

/ / /

/ / /

## SEVENTEENTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
### (By Plaintiffs Against Defendants)

210.   Plaintiff incorporates paragraphs 1 through 109, inclusive, with the same force and effect as though fully set forth herein.

211.   Unjust enrichment is a general principle which holds that an "individual is required to make restitution if he or she is unjustly enriched at the expense of another." (Am. Master Lease LLC v. Idanta Partners, Ltd. (2014) 225 Cal.App.4th 1451, 1481.)  Furthermore, it "is not essential that money be paid directly to the recipient by the party seeking restitution . . . the emphasis is on the wrongdoer's enrichment, not the victim's loss." (Ibid.)

212.   Plaintiffs owns propriety SAPN technology.

213.   Defendants have obtained federal funding and applied for a U.S. patent using Plaintiffs' propriety SAPN technology, even though Defendants had no right to do so.

214.   On information and belief, Defendants have benefitted from their unlawful use of Plaintiffs' SAPN technology by obtaining such federal funding, among other benefits. It would be unjust to allow Defendants to retain such benefits of Plaintiffs' use without disgorging the amount of money Plaintiff has accumulated in his account.

## EIGHTEENTH  CLAIM FOR RELIEF
## INJUNCTIVE RELIEF
### (By Plaintiffs Against Defendants)

215.   Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 214, inclusive, with the same force and effect as though fully set forth herein.

216.   As a direct and proximate result of Defendants' ongoing wrongful acts, Plaintiffs have suffered and will continue to suffer substantial pecuniary losses and

irreparable injury to his finances.

217.   To the extent Plaintiffs have no adequate remedy at law to compensate him for his continuing injuries inflicted by Defendants, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth below:

1.   For general damages according to proof, plus any applicable rate of interest;

2.   For special damages according to proof;

3.   For punitive damages against Defendants, as permitted by law;

4.   For attorney's fees as permitted by law;

5.   For costs of suit as permitted by law;

6.   For interest at the legal rate provided by law;

7.   A judgment that Plaintiffs directly infringe the '318 Patent

8.   A judgment that Plaintiffs directly infringe the '337 Patent;

9.   A judgment that Plaintiffs directly infringe the '110 Patent;

10.   For an order correcting the inventorship on the 16/535,534 Patent Application to identify Peter Burkhard as the sole inventor;

11.   For the imposition of a constructive trust requiring that Defendants hold the 16/535,534 Patent Application for the benefit of Peter Burkhard;

12.   For injunctive relief; and

For such other and further relief as this Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

1    **JURY DEMAND:** ADDITIONALLY, Plaintiff demands trial of this matter by jury.

2

3                                     Respectfully submitted,

4

5

6    DATED:  September 19, 2023

7

8

9

10                          By:  /s/ Chad M. Mandell

11                               Chad M. Mandell (Cal. Bar. No. 272775)
                                 **THE LAW OFFICE OF CHAD M.**
12                               **MANDELL**
13                               16350 Ventura Boulevard, Suite D-807
                                 Encino, California 91436
14                               Telephone: (310) 595-6368
15                               chadmandell@mandell-law.com

16
                                 Franklin S. Abrams, Ph.D. (*pro hac vice*
17                               forthcoming)
18                               **HOFFMAN WARNICK, LLC**
                                 540 Broadway, 4th Floor,
19                               Albany, New York 12207
20                               Telephone: (518) 334-6310
                                 fabrams@hoffmanwarnick.com
21

22                               Counsel for ALPHA-O PEPTIDES AG and
23                               PETER BURKHARD, PH.D, Plaintiffs

24

25

26

27

28

**COMPLAINT**